All right, we'll call our first case of the afternoon, Cobble v. Schwan Home Service. Good afternoon. My name is John Newborg. Excuse me, I represent the appellant, David Cobble, and I would like to reserve four minutes of rebuttal. That's granted. This is an appeal from an entry of summary judgment, and the issue is whether, based on the record, it would be inconceivable for any jury to ever find in favor of the appellant. The first question, just some, get some things out of the way. I was surprised in looking at this that the division manager, Mr. Cobble's division manager, Mr. Danbrook, how come he wasn't deposed? He wasn't deposed because I had incriminating emails, and I didn't think it was necessary. Now, the problem with the emails is that they're claiming that those emails, some of the incriminating emails, the ones that were most incriminating, were fabricated. Wouldn't that be a great thing to do, is depose him, as to why he, Danbrook, somehow believed that they weren't fabricated? Or they were fabricated, excuse me, and why you believe they were not? Well, let me say this, that first of all, Mr. Cobble certainly denies it. Oh, I understand. They're fabricated, and Mr. Cobble isn't some kind of computer whiz. He's just a regular guy, and I think that the claim is completely unbelievable. And I don't think that the appellee can get around giving Mr. Cobble the right to get in the witness stand and say what he saw on his computer, because they have... I thought some of them were forwarded either to you, you were counsel back then, was that right? He forwarded to me one of the emails they're claiming is false. There's two they're claiming are false. But for our purposes, they're part of the record. I'm sorry. They're part of the record for our purposes. Yes. And for purposes of what the district court decided. Yes. They were assumed to be genuine. Right. The district court didn't say that they're... I'm not going to consider them because they're phony. I'm not... I don't put a lot of weight behind them, but I wanted to back up and say that back to Mr. Danbrook, he did submit an email that nobody is claiming is false. That said almost exactly the same thing as the one that they're claiming is false. There's one sent on 1029, and there's one sent on 1019. The one on 1029, the one that says delete message? Yeah, that's the one they're claiming is false. The one on 1029, or I think 1019, I'm sorry. It's got to be 1019 because 1029 is the one they're claiming was fabricated. 1019, Mr. Danbrook sends an email, and nobody's claiming this is false. What's the appendix site on that one? I'm looking at my brief at page 20. I'm not really sure. All right, don't worry about it. Well, I can find it. The ones I have are like, I have one on 1029 on 471. Right. And 1019 I have... 474. 474, right. Or 10... I have 1018, I guess. Yes. What's your best evidence? Well, the best evidence... That he was required as a condition for employment or continuation of employment to take a polygraph test. Well, the best evidence is the testimony at A 509, 510 where Mr. Cavill testifies as follows. When did Mr. Danbrook tell you that if you had taken the polygraph things would have turned out differently? Mr. Cavill testifies on the fourth... Yeah, if he had taken the polygraph, that view was that he would have cleared himself. That's everyone was was really hoping that Mr. Cavill would have cleared himself. It would have made things a lot easier, right? No, that's what I'm talking about is when Mr. Danbrook says to Mr. Cavill, and this is Cavill's testimony on the 4th of December, Gary Danbrook, with the conversation that I told him I was leaving, he told me, and there's a lot of details here, he sat across at my spot of the desk, and he got kind of choked up. And he said, no, and I said, if I would have taken the polygraph, would I be in this situation? Meaning, demoted and given employment options that were untenable. And he goes, no, that's why we wanted you to take it. Because the presumption being he would have been cleared by that. He would have been cleared and the whole thing would have been cleared up and he wouldn't have been the one who was guilty of this offense. Well, the yes, Danbrook believes he would have, because I don't think Danbrook believes he was guilty, actually. I'm not sure anyone really thinks he took the money. Well, the difficulty from a factual standpoint is that after he was put on suspended, he was, you know, suspended, the problem went away. Well, a number of people were fired at the same time. And on top of that, if you're the one taking the money and they blamed this guy, you think, well, hey, I'm in the clear. I got away with it. So I don't think that eliminates the jury deciding whether. But the flaw in the ointment here is that the Erie route manager, I think his name is Dan Gregory, also refused to take the polygraph test and he was not terminated. Well, that was after Mr. understood, but still he refused to take the polygraph test and he wasn't terminated and he only left some years later when he got found another job. Well, that's because they changed the policy. And this isn't in my brief, but I think it's very important. Changed the policy? I thought that in this case, you have an October 26 memo from the General Counsel saying be careful, know what the policy is. The policy is that we do not force people to take polygraph tests. Well, that's not true. And let me show you why. On page A304, the question is asked of Mr. Hirsch, who's the man of Bob Danbrook. Were you aware of any Schwann's policy at the time of these conversations we're talking about? Prohibiting placing pressure on an employee to take a polygraph. Answer, no. They changed the policy. When did they change the policy? When did they change the policy? Well, they changed it after this Cobble episode arose. That's when they changed it. But the issue isn't pressure to take a polygraph. The issue is was he required as a condition. Right. That's the jury's issue. To his continued employment. Exactly. And he wasn't. That's the issue for the jury. He never took it. So he wasn't required. Was he? Well, required if you don't take it, you get fired. Well, okay, you're saying that he was fired for not taking it. Exactly. That's a, that's a, that's, that is the issue. That's the issue for the jury. And they say, no, he was fired because once, I mean, because he changed the policy, people weren't depositing their own money. He was. And then when that stopped and he was no longer there, the problem went away. I mean, that's a little bit of a two plus two is four in terms of, you know, a basis for for firing, is it not? Well, if the problem going away doesn't prove that he stole anything, the case never pursued this. No, but it might prove in their mind why they needed to clean house because, I mean, circumstantially. Well, the precedential case that talks about the polygraph is that Perks case. And that case states that if there's, if there's a legitimate reason to fire someone, but it could be because they didn't take a polygraph, then it's a jury question. Referring to Perks, my document doesn't have the page, but the statement is when the fact finder can infer one conclusion which violates public policy and one which is plausible and legitimate, invasion of the jury's province is improper. That's what this case is. Was there sufficient evidence in the record to demonstrate that there were reasons, legitimate reasons, to terminate him or transfer him? Well, we would, we'd argue no, quite frankly. These procedure changes were mandated to him, we argue. They, when they told him to take the money himself, that was to keep the drivers from taking the money. He was told to do that. And there's other emails in the record where they said he was being, one of the people up in the home office said he was being scapegoated. So we're not claiming that he did anything wrong, quite frankly. The interesting thing is, if you're going to terminate somebody, you just normally just say, okay, you're out of here. But didn't they offer him at least two other positions and he turned them down? They were significant demotions at significantly lower pay, and one of them was a significant distance away. And on top of that, at this point, he didn't trust them. So he was forced out and he was immediately suspended when he didn't go to the polygraph. That happened immediately. It wasn't after some long debate and consideration. Immediately suspended when he didn't go to the polygraph. What was the exact timing? Five days. The polygraph and the five days. Five days. One of the, and part of that was a weekend. So in addition, we have that email where they're telling him not to tell the other people he didn't take a polygraph because we're trying to get these polygraphs set up. I mean, all they had to do is say, you know, Dave, don't worry about the polygraph. Period. But all it is, is pressure, pressure, pressure. Take the polygraph. We want you to take the polygraph. The polygraph will clear your name. And then one of these messages, which they wanted to be deleted, said his job could depend on taking the polygraph. This is for the jury to decide. Let me go back to one of Judge Randell's questions, which is troubling. The, in this case, you're allowed to suggest as an employer, I think you ought to take the polygraph. That's not the violation of the law, is it? It's when you require somebody to take the polygraph. Of course, the case is going to be all circumstantial evidence. If I, if the supervisor says, gee, Dave, I think you ought to take the polygraph, and then Dave says, I don't think I'm going to take the polygraph, and then one day later he's fired, that's circumstantial evidence that they anticipated, expected, and required him to take the polygraph. You can't just change the fact that they fired him right after he didn't take the polygraph. That's very important. Although what they're, what they're in effect saying is, I guess, okay, your point is, it's, they're saying that they fired him because they weren't, he was the one in charge, the buck stopped with him, $50,000 was missing, plus other property, and you're saying, okay, they have to prove that to a jury, is your point? Exactly. Okay. Thank you. Thank you. Good afternoon. I'm a Liberty Wyant, and I represent Schwann's Home Service, Inc. This case comes down to, it's about an employee who is trying to use the anti-polygraph statute as a shield. Well, but isn't it also about what, what inferences you draw from certain people's statements? I mean, the statement that, gee, you should have taken the polygraph, looking at it from one standpoint, it says, well, because it would have cleared you. Looking at it on the other side, it could be because if you're just not going to cooperate, you know, we're just not going to want you here anymore. Is this for a jury, or is this for a judge to decide? I don't think so, because I think the statute requires, or the statute says that it requires as a condition of employment. And here, this is an afterthought statement, first of all. It's something that's said after the fact that it's already happened. But what definitively makes it not an issue of material fact as to whether he was terminated because he didn't take the polygraph, or he was merely, it was merely suggested to him that he should take the polygraph? Well, that's a question of fact, and I don't think the district court can weigh in on that, can it? Well, but a suggestion that he takes the polygraph doesn't violate the statute. No, no, if that's correct, you're right, if that's the case. But I don't know if it is. And that's not for a court on summary judgment to resolve. That's certainly not for us to resolve. And it would seem that that's a jury question. I mean, his point is, the fix was in. I was going to be terminated if I didn't take the polygraph test and pass it. And you're saying, nope, that's not the case. How can a court resolve that, not just material, but critical issue at summary judgment? In my brief, I cite to a case that says, because this is an issue, this is a public policy exception to the at-will firing in Pennsylvania. And the case says, even if he took the polygraph test, and even if he failed the polygraph test, the employer still has a right to fire an employee who it feels violated its own policies, engaged in mismanagement. Well, if he took the polygraph test and failed it, that's probably fairly easy. But how do you distinguish the Perks case from our court way back when in 79? I mean, there we reversed summary judgment, where there was evidence that the employee was fired for refusing to take the polygraph test. He's put in some evidence. He's also pointed to some emails, although you're claiming that some of them were made up. But that clearly is a question for a jury to resolve, isn't it? Well, yes, but in that case, the employer directly requested and set up the test, had everything orchestrated. And here, the evidence is very clear. There's affidavits from both Corporal Calkins and the State Officer McKee that they were the ones that wanted the polygraph test as part of their criminal investigation. But that doesn't mean that the employer didn't want it. Or that it wasn't going to take action if he didn't take it. True. But again, the law that I cited in, let me just find the case, it is the Gillespie versus St. Varsity case, 513-82D-471, says that a company, even if there was a, the employee was found to have taken the polygraph test or refused to take it. As long as the employer fires the employee for mismanagement, misconduct, theft, the evidence in this case is replete of all of the mismanagement that Mr. But what do we have that is evidence that that is the reason and the only reason that he was fired? What do we have to show that? Well, we have all of the affidavits from all of the supervisors, employees that say that that's the reason. Carvel did not depose the main two or three people in the case that he should have deposed. All we have is his statement saying that he thinks that he was fired because of the polygraph test. He's got emails. I agree that some of what you say were made up, but he's got several emails and he's got early December conversations or with Dan, or maybe right around the time he was terminated, with Dan Brook and Hirsch. I mean, that's a pretty good bit of evidence. Now, again, maybe he's not believed. You may win completely in the end, but I've got a real problem as to why this is being resolved at summary judgment. Well, the issue still becomes to the issue of whether he was required. These type of purgings or these conversations that they may have had were all mostly instigated by Carvel himself. He would go to them and he would say, you know, Dan Brook, what do you think? Should I take the polygraph test? It's almost as if he baited them. Let me interrupt and ask you this. Now, in terms of the summary judgment standard, it's plenary for us. Now, one, the contested emails, the magistrate judge in deciding this indicated that she gave Mr. Carvel the benefit of the doubt and said that she accepted those as true. However, if the matter is tried, could not the jury not only consider that they were vehemently denied by the company and offered by the plaintiff? Mr. Carvel in the lower court. And the jury could also consider the fact that they're deciding credibility and also wonder why or opine why there would be this vehemence in terms of a denial that they even existed and take that into consideration as motive. Well, when those emails were produced to us and we took them to the Schwann's persons that were involved, Georgia Terrell. You pull the microphone over. Sure. Georgia Terrell and Gary Dan Brook, they instantly, when they saw the email, said, I didn't write these emails. But isn't that credibility for the jury to decide as to whether they did or not? Well, exactly. In part, but we hired an expert to go back and they went through all of Schwann's computer backup. The jury could disregard what the experts say and particularly if they hear how much the expert was paid, correct? Well, yes, but Carvel doesn't have anything to refute it. Part of the problem in this case of authenticity is it's going to be his burden to prove authenticity. And in his deposition transcript, he testifies that he had the emails. He saved them on his computer at Schwann's. Then he took them from the saved folder and he forwarded them to, I think it's a Yahoo account. I understand your argument, but my question still is, isn't that something that the jury has to decide whether they accept him as being believable or not? Possibly, but even if he's believable, there are still overwhelming evidence. Even if he was forced to take that polygraph test and even if he failed it, and even if Schwann's fired him because he failed the polygraph test, the evidence is overwhelming that this particular employee engaged in serious misconduct. He has admitted that he failed to follow policies. He had cash in his hand from route managers that he should not have had. He was depositing bank bags to the bank, which he should not have been depositing. But shouldn't the jury decide whether that's protectual? Yeah, that's a great argument for a jury. I don't think so, because Covell doesn't have anything to refute that. He admits that all of these things were true. He admits that he had the cash in his hand. There's no dispute there. He admits that he took the bank bags to the bank. There's no dispute there. He admits that there was $50,000 missing under his name. But he denies that he was responsible for the $50,000. He denies that, yes. I mean, I thought you said earlier at the beginning of our argument that the question of whether the emails were or were not fabricated is irrelevant for your purposes of determining that he was fired. And now you're saying later on that you had the only evidence with a forensic expert that they were fabricated, and therefore that must be accepted as a fact. Well, that was to his question. It's irrelevant for the purposes today whether they were fabricated or not. The district court assumed that the emails were true. And the district court even typed out the emails in the text of its order and said, even if we assume all of these things are true, it still does not reach that threshold level of having to require an employee as a condition of continued employment to take a polygraph test. What would be the evidence to indicate that there was a requirement short of the employer saying, yes, we did, we required it? Well, Cavell himself testifies that no one ever said that to him. He says that, you know, all he has are the statements from Hirsch, allegedly, because remember, there's no testimony in Hirsch's deposition. He wasn't asked about that in his deposition. That as an after effect, the Schwan's employee said, well, things might have been different had he taken the test. Well, the interesting thing is when he says, would that have helped me? Well, I believe it would have helped. Now, by that, he must mean, if you had taken it, you would have been cleared. Presumably, presumably, but it's too late now. So, you didn't take it. Well, initially, the supervisors at Schwan's didn't think Cavell was involved in it. Exactly. I mean, in fact, it's kind of shocking how everybody is really wanting to take this polygraph, ostensibly, to clear himself. So, then they say, well, okay, he didn't take it, so he did do it and then fire him? I mean, a lot of question about exactly what these back and forth really mean as compared to, well, unless you take it, you're going to be fired. And, you know, it's too late and you didn't take it. So, you know, reasonable minds might differ. Well, I wouldn't say that Schwan's really wanted him or had an interest in him taking the polygraph. If the October 29 email was not fabricated, where Terrell purportedly wrote to Danbrook, Gary, that's Danbrook, you need to speak with Dave Cavell about taking the polygraph. He trusts you and his position could depend on it. Right now, with refusing it, makes him look guilty. Delete message. If that's not a fake, that's pretty darn damning. Well, we don't really know what Georgia Terrell meant in that email because she wasn't deposed, she wasn't cross-examined about the email, and there is no evidence on that topic. One could argue it speaks for itself. Second, again, it's... Why would a jury be allowed to infer with delete at the end of that sentence? Well, I mean, it insinuates that she wanted the message destroyed. For what reason? That I would assume she didn't want other people to see it. But I don't know that, and there's no fact in the record to substantiate any of that because Georgia Terrell wasn't deposed. But again, the district court, in reviewing that email and looking at it, specifically said that that type of email wasn't urging. It wasn't something that proved that Schwann's required Covell to sit for the polygraph test as a condition of... Did you depose Georgia Terrell? I did not. She was... I mean, if you wanted that evidence in it, because if you're... And Mr. Newberg's... We did submit an extensive affidavit from Georgia Terrell, which sets forth her interpretation of the situation. If you're in your opponent's position, I'm not so sure you would necessarily want to depose her because you know that she's going to give some other reason. And you have, you know, again, assuming this is a legitimate email, you have in front of you a smoking gun. That's unless you're, you know, your client... You know that your client can't authenticate the actual document. Authenticate, you're right, you're right. Authenticate the document and you don't want to damage your client's case. I understand, but if we're one in your opponent's position, I'm not sure he would necessarily want to depose Ms. Terrell. Well, at the very least, I think when push comes to shove, if she were deposed and were asked, well, you know, why did you say, you know, assuming you wrote this, why would have you said, you know, delete message? She would have been able to explain if she in fact had written it, what her intent was. I mean, for the purposes of motion for summary judgment, Cavell has to have concrete evidence. He can't have his own conclusions as to what the evidence means. He, you know, he has to have more than that. And all he has here is his own deposition statements, which are self-confessed. He's got his own deposition statements. He's got these purported emails and he's got the conversations he had with Hirsch and Danbrook. And that's... Which are after the fact and only confirm that, yeah, it would have been nice had he taken it because maybe he could have cleared his name. When was the investigation in relation to the taking of the polygraph? Was it concluded before then? I believe the timeline was Schwann started its own investigation internally because of the banking procedures. The banking records in corporate headquarters show that they were late in missing deposits and the documents weren't jiving with what was actually deposited in the bank. They started their own investigation, which started at headquarters in Marshall, Minnesota. Georgia Terrell is headquartered there. She came to the... I'm talking timing. And when when was the investigation, when was he put on administrative leave? The investigation was still pending at that time. At Covell's direction, three employees had been fired during the pendency of that investigation and the theft still hadn't stopped. So at a certain point in time when Georgia goes in and she actually starts to go through the bank records herself and she adds up all the facts that Mr. Schwann had, she adds up enough facts in relation to when the polygraph was because he was fired five days after not taking the polygraph. It was all in the round same pocket of time. I mean, she she was here for, I think, about a six week period. And when she came, it was also reported to the Pennsylvania state police who was doing their own independent investigation. And they were the ones that requested the polygraph. It wasn't something that Schwann's instigated on its own. Now, had the had the police never been involved, had the police never asked for the polygraph test, you know, the testimony in the affidavits is that Schwann's would have fired Mr. Covell because of the litany of things that he had done that had cost $50,000 to go missing from the Schwann's depot under his management. Thank you. Thank you very much. All right, Mr. Newborg, rebuttal. So, Your Honor, I don't think I require any rebuttal. All right. Fine. Thank you. Case is well argued. Take it under advisement.